

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2021 APR 23  A 10: 13

CLERK'S OFFICE
AT GREENBELT



**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Southern Division*

| | | | |
|---|---|---|---|
| *Elizabeth G. Wright*<br>*Assistant United States Attorney*<br>*Elizabeth.Wright2@usdoj.gov* | *Mailing Address:*<br>*6500 Cherrywood Lane, Suite 200*<br>*Greenbelt, MD 20770-1249* | *Office Location:*<br>*6406 Ivy Lane, 8th Floor*<br>*Greenbelt, MD 20770-1249* | *DIRECT: 301-344-0866*<br>*MAIN: 301-344-4433*<br>*FAX: 301-344-4516* |

March 25, 2021

Christopher C. Nieto, Esq.
Nieto Law Office
1 North Charles Street, Suite 1301
Baltimore, MD 21201

Re: <u>United States v. Marian Unguru,</u>
Criminal No. TDC-20-317

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Marian Unguru (hereinafter "the Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by **5:00 p.m. on April 8, 2021**, it will be deemed withdrawn. The terms of the Agreement are as follows:

### Offense of Conviction

1. The Defendant agrees to plead guilty to Count One of the Superseding Indictment, which charges the Defendant with Conspiracy to Commit Bank Fraud and Wire Fraud, in violation of 18 U.S.C. § 1349. The Defendant admits that the Defendant is, in fact, guilty of the offense and will so advise the Court.

### Elements of the Offense

2. The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: That on or about the time alleged in the Superseding Indictment, in the District of Maryland, (1) the Defendant and at least one other person entered into the unlawful agreement charged in the Superseding Indictment, that is, a conspiracy to commit bank fraud and wire fraud; and (2) the Defendant knowingly and willfully became a member of that conspiracy.

Penalties

3.   The maximum penalties provided by statute for the offense to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 1349 | N/A | 30 years | 5 years | $1,000,000 (or twice the gross gain or loss, whichever is greater) | $100 |

    a.   Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

    b.   Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

    c.   Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

    d.   Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

    e.   Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

    f.   Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant

agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

## Waiver of Rights

4. The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

    a. If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

    b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

    c. If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

    d. The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

    e. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

    f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

g. If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

h. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

5. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6. This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

a. This Office and the Defendant further agree that the applicable base offense level is **7**, pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2B1.1(a).

b. A **14**-level increase applies, pursuant to U.S.S.G. § 2B1.1(b)(1)(H), because the actual loss reasonably foreseeable to the Defendant and within the scope of the conspiracy was more than $550,000 but was not more than $1,500,000.

c. A **2**-level increase applies, pursuant to U.S.S.G. § 2B1.1(b)(2), because the offense involved 10 or more victims.

d. A **2**-level increase applies, pursuant to U.S.S.G. § 2B1.1(b)(11), because the offense involved the possession or use of any authentication feature and the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification.

e. This Office does not oppose a 2-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a) based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional 1-level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a), and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

7. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8. Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Obligations of the Parties

9. At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Superseding Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

## Restitution

10. The Defendant agrees to the entry of a restitution order for the full amount of the victims' losses, which the parties stipulate is at least **$1,115,571.68**, to be joint and several with the co-defendants. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The total amount of restitution shall be due immediately and shall be ordered to be paid forthwith. Any payment schedule imposed by the Court establishes only a minimum obligation. Defendant will make a good faith effort to pay any restitution. Regardless of Defendant's compliance, any payment schedule does not limit the United States' ability to collect additional amounts from Defendant through all

5

available collection remedies at any time. The Defendant further agrees that the Defendant will fully disclose to this Office, the probation officer, and to the Court, subject to the penalty of perjury, all information (including but not limited to copies of all relevant bank and financial records) regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this Agreement, and this Office may seek to be relieved of its obligations under this Agreement.

## Forfeiture

11. The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offenses, substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

12. Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in the following items that the Defendant agrees constitute money, property, and/or assets derived from, obtained by the Defendant as a result of, or involved in, the Defendant's illegal activities:

   a. a money judgment in the amount of at least $22,200 in U.S. Currency, equal to the proceeds the Defendant obtained as a result of the conspiracy; and

   b. approximately $14,100 in U.S. currency seized from the Defendant during execution of a search and seizure warrant in Baltimore, Maryland, on or about October 9, 2020.

The Defendant agrees that due to the Defendant's acts or omissions, the full amount of the proceeds he obtained a result his offense are not currently available to the Government for forfeiture, and that the Government is entitled to forfeiture of substitute assets because one or more of the conditions in 21 U.S.C. § 853(p) have been met.

13. The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. This Office agrees to seek the Attorney General's approval to apply forfeited assets to the Defendant's Restitution Order.

14. The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

15. The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

## Waiver of Appeal

16. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

   a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute, to the extent that such challenges legally can be waived.

   b. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

      i. The Defendant reserves the right to appeal any term of imprisonment to the extent that it exceeds any sentence within the advisory guidelines range resulting from an offense level of **22**; and

      ii. This Office reserves the right to appeal any term of imprisonment to the extent that it is below any sentence within the advisory guidelines range resulting from an offense level of **22**.

   c. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Defendant's Conduct Prior to Sentencing and Breach

17. Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will

cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

18. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

## Court Not a Party

19. The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

20. This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Jonathan F. Lenzner
Acting United States Attorney

Elizabeth G. Wright
Assistant United States Attorney

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

03-31-2021
Date

Marian Unguru

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

3/31/21
Date

Christopher C. Nieto, Esq.

## ATTACHMENT A

## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

Beginning at least in or about June 2018 and continuing through at least in or about October 2020, the Defendant, **MARIAN UNGURU ("UNGURU")**, a resident of Maryland, knowingly and willfully conspired with **Diape Seck, Mateus Vaduva, Marius Vaduva, Nicolae Gindac, Daniel Velcu, Vali Unguru**, and others: (1) to execute a scheme and artifice to defraud victim financial institutions, and to obtain money owned by and under the custody and control of the victim financial institutions by means of materially false and fraudulent pretenses, representations, promises, and omissions, in violation of 18 U.S.C. § 1344; and (2) to devise a scheme and artifice to defraud the victim financial institutions, and to obtain money from the victim financial institutions, by means of materially false and fraudulent pretenses, representations, promises, and omissions, and, for the purpose of executing and attempting to execute the scheme to defraud, did knowingly and willfully transmit and cause to be transmitted by means of wire communication, in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. § 1343.

As part of the conspiracy and scheme to defraud, **UNGURU** and his co-conspirators stole from the U.S. mail checks directed to and from religious institutions, including donation checks directed from individuals to such religious institutions ("the stolen checks"). The co-conspirators conducted such thefts by driving to the roadside mailboxes of churches and other religious institutions and removing the mail from those mailboxes, from which donation checks were thereafter selected.

**UNGURU** and his co-conspirators fraudulently negotiated the stolen checks at victim financial institutions such as TD Bank ("TD Bank"), SunTrust Bank/Truist ("Truist"), and Bank of America ("BOA"), and other consumer banks (the "victim financial institutions"), often by depositing the checks into the fraudulently opened bank accounts by way of automated teller machine ("ATM") transactions. The victim financial institutions were financial institutions within the meaning of 18 U.S.C. § 20 in that their deposits were insured by the Federal Deposit Insurance Corporation.

Known to **UNGURU** and in concert with him, **Vali Unguru** and other co-conspirators also fraudulently opened bank accounts at the victim financial institutions, under false identities, and often in coordination with **Diape Seck**, an employee of one of the victim financial institutions, in order to have those bank accounts receive the stolen checks and disburse those funds for the benefit of the co-conspirators ("the fraudulently opened bank accounts"). **UNGURU** deposited stolen checks into both the fraudulently opened bank accounts and into bank accounts held in his own or a family member's identities.

**UNGURU** and his co-conspirators subsequently withdrew money from the fraudulently opened bank accounts through ATMs and spent the fraudulent proceeds using debit cards associated with the fraudulently opened bank accounts.

From approximately August 3, 2018, through approximately April 26, 2019, **UNGURU** negotiated at least 30 stolen checks (including from churches in Maryland and Virginia) into an M&T account ending in 2919 and a Wells Fargo account ending in 6275 at ATMs in Severn, Linthicum, Halethorpe, and Baltimore, Maryland. **Vali Unguru** also transacted on the M&T account ending in 2919 and negotiated two stolen checks into the Wells Fargo account ending in 6275.

From approximately August 22, 2018, through approximately September 26, 2018, **UNGURU** negotiated at least 20 stolen checks (including from churches in Maryland and Virginia) into a Wells Fargo account ending in 6160, which was one of the fraudulently opened bank accounts, at ATMs in Linthicum, Maryland. **UNGURU** had used a fraudulent Italian passport and driver's license to open both the Wells Fargo account ending in 6160 and a TD Bank account ending in 0812, into which stolen checks also were deposited.

From approximately May 4, 2020, through approximately June 1, 2020, **UNGURU**, **Vali Unguru**, and their co-conspirators negotiated at least 39 stolen checks totaling approximately $5,892.85 (including from churches in Maryland, Virginia, and North Carolina) into a Wells Fargo account ending in 2461, which was one of the fraudulently opened bank accounts. **UNGURU** withdrew funds from this account, as well. From approximately August 26, 2020, through approximately September 8, 2020, **Vali Unguru** negotiated two stolen checks (including from a church in Virginia) into a BOA account ending in 8747, which was one of the fraudulently opened bank accounts. **UNGURU** and **Vali Unguru**, as well as at least one other family member, conducted multiple ATM transactions on this account.

Further, **UNGURU** and **Vali Unguru** coordinated with **Diape Seck** for the opening of a TD Bank account ending in 5371. **Vali Unguru** deposited at least 15 stolen checks totaling approximately $4,468.73 into that account from approximately December 2, 2019, through approximately January 21, 2020, and withdrew at least $1,100 from that account, as well. In total, co-conspirators deposited at least 43 checks totaling approximately $11,846.86 into that account.

On or about April 15, 2020, **UNGURU** negotiated three stolen checks into, and withdrew $500 in cash from, a Truist account ending in 3675, which was one of the fraudulently opened bank accounts, at a Truist ATM in Glen Burnie, Maryland. **UNGURU** deposited at least 15 stolen checks totaling $5,913 into that account, and withdrew at least $5,500. In total, co-conspirators deposited into that account at least 46 stolen checks, totaling $21,805.

On or about May 15, 2020, U.S. Customs seized from incoming international mail addressed to **UNGURU**'s residence fraudulent Italian identity documents containing photographs of **Vali Unguru** and a false name; analysis of those documents showed that the new name and photographs had been added onto documents previously in a different false name that had been used to open at least one of the fraudulently opened bank accounts. **UNGURU** also used false

names and accompanying fraudulent identity documents containing his photograph to open bank accounts and receive ATM cards and account information for those accounts.

During the course of the conspiracy, **UNGURU** personally deposited at least approximately 90 stolen checks, totaling at least approximately $35,662.78, and withdrew at least approximately $22,200 from the accounts that received the checks. The accounts that **UNGURU** personally deposited checks into received at least approximately $154,987.95 from approximately 421 stolen checks.

Five additional accounts in the same names as accounts **UNGURU** personally deposited checks into received at least approximately $44,968.57 from approximately 167 stolen checks, and had at least approximately $38,540 withdrawn.

**Vali Unguru** personally deposited at least approximately 111 stolen checks, totaling at least approximately $63,756.37, and withdrew at least approximately $27,060 from the accounts that received the checks. The accounts that **Vali Unguru** opened, personally deposited checks into, or otherwise transacted on, but which are not otherwise counted above as to **UNGURU**, received at least approximately $220,164.79 from approximately 492 additional stolen checks, and had at least approximately $186,530 withdrawn.

In addition, co-conspirators deposited at least approximately $695,450.37 in stolen checks into the accounts opened by **Diape Seck** as part of this conspiracy, totaling at least approximately 1,574 checks. Both **Vali Unguru** and additional family members of **UNGURU** attended the account openings of multiple bank accounts with **Diape Seck** as part of the conspiracy. Those accounts received at least approximately $37,429.63 from approximately 133 stolen checks, and had at least approximately $31,796.60 withdrawn.

The above-described accounts received at least approximately $1,115,571.68 from 2,654 stolen checks. Based on the length, scope, and type of **UNGURU**'s involvement in the fraudulent conduct and his relationship with other conspirators, more than $550,000 but not more than $1,500,000 in actual and intended loss was foreseeable to **UNGURU** and within the scope of his conspiratorial agreement.

On October 9, 2020, law enforcement executed a search warrant at **UNGURU**'s residence in Baltimore, Maryland, and recovered approximately $14,100 from **UNGURU**. The seized funds were proceeds obtained by **UNGURU** as a result of the conspiracy. In total, **UNGURU** obtained at least $22,200 in U.S. currency as a result of the conspiracy.

SO STIPULATED:

_____
Elizabeth G. Wright
Assistant United States Attorney

_____
Marian Unguru
Defendant

_____
Christopher C. Nieto, Esq.
Counsel for Defendant

13